OFFICE OF
INSPECTOR GENERAL
UNITED STATES POSTAL SERVICE

OFFICE OF INSPECTOR GENERAL
UNITED STATES POSTAL SERVICE

Management
of Electronic
Technicians'
Overtime at
the Madison
Processing &
Distribution Center

Audit Report

Report Number
HR-AR-16-005

September 27, 2016

*Post Office*

EXHIBIT

3



OFFICE OF
**INSPECTOR GENERAL**
UNITED STATES POSTAL SERVICE

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

# Highlights

*The U.S. Postal Service uses overtime to provide flexibility and meet operational requirements. Overtime is a premium that non-management employees receive for work performed in excess of 8 paid hours in a day or 40 paid hours in a week.*

## Background

The U.S. Postal Service uses overtime to provide flexibility and meet operational requirements. Overtime is a premium that non-management employees receive for work performed in excess of 8 paid hours in a day or 40 paid hours in a week. Penalty overtime is paid at two times the hourly rate when an employee works overtime on more than 4 of their 5 scheduled days in a week or more than 6 days in a week or over 10 hours on a regularly scheduled day or over 8 hours on a non-scheduled day. On a quarterly basis, employees willing to work overtime can voluntarily place their name on the overtime desired list.

This report responds to a request from Senator Ronald H. Johnson of WI, to review the alleged misconduct of 13 electronic technicians that resulted in unnecessary overtime at the Madison, WI, Processing and Distribution Center (P&DC) in the Lakeland District of the Great Lakes Area.

Electronic technicians in the Postal Service's field maintenance organization perform diagnostic, preventive maintenance, calibration, and overhaul tasks on a variety of mail processing, customer service, and building equipment and systems.

During fiscal years (FY) 2014 and 2015, the facility had 22 and 18 electronic technicians onboard, respectively, and had 15 onboard by May 31, 2016. This report addresses the 13 electronic technicians mentioned in the congressional inquiry.

Our objective was to assess the management of electronic technicians' overtime at the Madison P&DC during FY 2014 through May 31, 2016.

## What The OIG Found

Madison P&DC maintenance management did not effectively manage overtime for the 13 electronic technicians. The overtime percentage to workhours for the 13 electronic technicians was 9.5 percent, which was higher than the other nine electronic technicians' combined 7.3 percent overtime percentage to workhours for FY 2014 through May 2016.

For FY 2014 through May 31, 2016, these electronic technicians logged 6,421 of 8,473 total overtime hours (76 percent), and 895 of 1,097 total penalty overtime hours (82 percent) reported by all electronic technicians at the facility. While the other nine electronic technicians averaged 228 overtime hours each, the 13 electronic technicians averaged 494 overtime hours each (117 percent greater). The 13 electronic technicians' annual overtime payment amounts ranged from $4,733 to $17,508 (between 7 to 27 percent) and from $2,511 to $12,540 (between 4 to 19 percent) of their salary in FYs 2014 and 2015, respectively. Specifically:

▪ Of the total 6,421 overtime hours and total 895 penalty overtime hours, the 13 electronic technicians received 2,317 (36 percent) and 258 (29 percent) on the weekends. These electronic technicians were generally scheduled off on the

Case 2:18-cv-00088-WED   Filed 01/17/18   Page 2 of 27   Document 1-3



# OFFICE OF
# INSPECTOR GENERAL
## UNITED STATES POSTAL SERVICE

weekend. Therefore, when they were called in to work on the weekends they received a guaranteed 8 hours of overtime.

In comparison, the other nine electronic technicians only reported 341 overtime and 2 penalty overtime hours on the weekends.

☐ Three of the 13 electronic technicians on Tour 1 had an average of 563 overtime hours, which was the highest average of overtime hours for all three tours.

We also found that:

☐ Five of the 13 electronic technicians had excessive daily Internet usage which exceeded the 18 minute daily average use.

☐ Management used electronic technicians instead of other qualified maintenance employees at a lower labor rate to move machinery. Eight of the 13 electronic technicians spent 38 percent more regular workhours moving machinery than the mail processing equipment mechanics (who are paid at a lower labor rate).

☐ Supervisors did not periodically evaluate electronic technicians' performance on maintenance routes, as required.

These incidents occurred because maintenance management regularly staffed three electronic technicians for each tour without determining workload and did not assign supervisors to oversee electronic technicians between 10:30 p.m. and 4:00 a.m. during Tour 1 and on weekends.

Management stated that P&DCs' current complement of three supervisors could not cover every hour of each tour; however, management could configure supervisors' schedules to cover Tour 1 and the weekends.

Maintenance supervisors also stated they did not monitor employees' computer usage because it was difficult to observe and identify employees improperly using Postal Service equipment during workhours. In addition, one of the five electronic technicians with above average computer use did not clearly understand the policy on limited personal use of Postal Service equipment and two others disregarded the policy.

Further, management assigned electronic technicians to move machinery because they believed it was more efficient. Management could use electronic technicians to assist when needed in the process and use lower paid maintenance employees who can perform similar duties. Lastly, management did not have a clear understanding of the policy to evaluate electronic technicians' performance on maintenance routes.

OFFICE OF
**INSPECTOR GENERAL**
UNITED STATES POSTAL SERVICE

As a result, the Postal Service incurred unnecessary overtime and penalty overtime costs of $214,155 during FYs 2014 and 2015. Additionally, we project management can potentially save at least $107,078 for FY 2016, by reducing electronic technicians' overtime and penalty overtime hours by 58 percent to achieve the average overtime usage of electronic technicians at comparable facilities. Management also incurred unnecessary labor costs of $1,676 during FY 2015 by not using qualified maintenance personnel paid at a lower labor rate to move equipment.

If management effectively aligns workforce with workload and provides sufficient oversight, the Postal Service could save funds by reducing unnecessary overtime.

## What The OIG Recommended

We recommended the acting district manager, Lakeland District, instruct maintenance management to reevaluate staffing practices, establish an oversight process to review and assign electronic technicians to better align maintenance coverage and control overtime usage, and develop a supervisors schedule to ensure oversight of maintenance personnel 7 days a week.

We also recommended management implement processes to monitor maintenance personnel's personal use of Postal Service computers, assign maintenance personnel to machine moving tasks, and perform periodical evaluations of maintenance employees' performance.

3

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-15-005



ATTRIBUTES OF THE FOLLOWING TWO GROUPS OF 22 EMPLOYEES AT THE MADISON P&DC

ELECTRONIC TECHNICIANS MENTIONED IN THE CONGRESSIONAL REQUEST

OTHER ELECTRONIC TECHNICIANS AT THE FACILITY

REPORTED 8,473 TOTAL OVERTIME HOURS

76% 6,421 of 8,473

24% 2,052 of 8,473

REPORTED 1,097 TOTAL PENALTY OVERTIME HOURS

82% 895 of 1,097

18% 202 of 1,097

COMBINED OVERTIME PERCENTAGE TO WORKHOURS OF 7.3 PERCENT

COMBINED OVERTIME PERCENTAGE TO WORKHOURS OF 9.5 PERCENT

7.3%

9.5%

ELECTRONIC TECHNICIANS AVERAGED OVERTIME HOURS EACH

53% LESS 228

9

13

494 HOURS

CONGRESSIONAL REQUEST

Case 2:18-cv-00088-WED   Filed 01/17/18   Page 5 of 27   Document 1-3

Appendices     Recommendations     Findings     Table of Contents     Highlights

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

# Transmittal Letter

OFFICE OF INSPECTOR GENERAL
UNITED STATES POSTAL SERVICE

September 27, 2016

**MEMORANDUM FOR:**   DEBORAH S. WOODRUM
ACTING DISTRICT MANAGER, LAKELAND DISTRICT



E-Signed by Charles Turley
VERIFY authenticity with eSign Desktop

**FROM:**   Charles L. Turley
Deputy Assistant Inspector General
for Supply Management and Human Resources

**SUBJECT:**   Audit Report – Management of Electronic Technicians'
Overtime at the Madison Processing & Distribution Center
(Report Number HR-AR-16-005)

This report presents the results of our audit of the Management of Electronic
Technicians' Overtime at the Madison Processing & Distribution Center (Project Number
16RG011HR000).

We appreciate the cooperation and courtesies provided by your staff. If you have any
questions or need additional information, please contact Monique P. Colter, director,
Human Resources and Support, or me at 703-248-2100.

Attachment

cc: Corporate Audit and Response Management

Case 2:18-cv-00088-WED   Filed 01/17/18   Page 6 of 27   Document 1-3

# Table of Contents

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-15-005

Cover

Highlights ........................................................................................ 1

Background .................................................................................... 1

What The OIG Found .................................................................. 1

What The OIG Recommended ................................................. 3

Transmittal Letter ........................................................................ 5

Findings ........................................................................................... 7

Introduction .................................................................................. 7

Summary ....................................................................................... 7

Management of Overtime ........................................................ 8

Overtime on Weekends ............................................................. 9

Overtime on Tour 1 ................................................................... 10

Above Average Internet Usage ............................................ 11

Moving Machinery .................................................................... 12

Employee Evaluations ............................................................. 13

Recommendations .................................................................... 15

Management's Comments ...................................................... 15

Evaluation of Management's Comments ........................... 16

Appendices .................................................................................. 17

Appendix A: Additional Information .................................... 18

Background .................................................................................. 18

Objective, Scope, and Methodology .................................. 18

Prior Audit Coverage ............................................................... 19

Appendix B: Management's Comments .............................. 20

Contact Information .................................................................. 26

Case 2:18-cv-00088-WED   Filed 01/17/18   Page 7 of 27   Document 1-3

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

# Findings

**Madison P&DC maintenance management did not effectively manage overtime for the 13 electronic technicians.**

**The overtime percentage to workhours for the 13 electronic technicians who are the subject of the congressional inquiry was 9.5 percent, which was higher than that of the other electronic technicians' combined 7.3 overtime percentage to workhours for FY 2014 through May 31 in FY 2016.**

## Introduction

This report presents the results of our audit of the management of maintenance personnel's overtime at the Madison, WI, Processing and Distribution Center (P&DC) in the Lakeland District of the Great Lakes Area (Project Number 16RG011HR000). The report responds to a request from Senator Ronald H. Johnson of WI, to review the alleged misconduct of 13 electronic technicians at the Madison P&DC which resulted in unnecessary overtime. Our objective was to assess the management of overtime by electronic technicians at the Madison P&DC during fiscal year (FY) 2014 through May 31, 2016.[1] See Appendix A for additional information about this audit.

Electronic technicians in the Postal Service's field maintenance organization perform diagnostic, preventive maintenance, calibration, and overhaul tasks on a variety of mail processing, customer service, and building equipment and systems. During FYs 2014 and 2015, the facility had 22 and 18 electronic technicians onboard, respectively, and 15 electronic technicians onboard by May 31, 2016. This report addresses the 13 electronic technicians mentioned in the congressional inquiry.

The U.S. Postal Service uses overtime to provide flexibility and meet its operational requirements efficiently. Overtime is a premium that non-management employees receive for work performed in excess of 8 paid hours in a day or 40 paid hours in a week. Penalty overtime is paid at two times an employee's hourly rate when they work overtime on more than 4 of their 5 scheduled days in a week or over 6 days in a week, over 10 hours on a regularly scheduled day, or over 8 hours on a non-scheduled day.

## Summary

Madison P&DC maintenance management did not effectively manage overtime for the 13 electronic technicians. The overtime percentage to workhours for the 13 electronic technicians who are the subject of the congressional inquiry was 9.5 percent, which was higher than that of the other electronic technicians' combined 7.3 overtime percentage to workhours for FY 2014 through May 31, 2016. During FY 2014 through May 31, 2016, these electronic technicians had a combined total of 6,421 overtime hours and 895 of 1,097 total penalty overtime hours (82 percent) reported by all electronic technicians at the facility. While the other nine electronic technicians averaged 228 overtime hours each, the 13 electronic technicians averaged 494 overtime hours each (117 percent greater). The 13 electronic technicians' annual overtime payment amounts ranged from $4,733 to $17,508 (between 7 to 27 percent) and from $2,511 to $12,540 (between 4 to 19 percent) of their salary in FYs 2014 and 2015, respectively.

Specifically:

■ Of the total 6,421 overtime hours and total 895 penalty overtime hours, the 13 electronic technicians received 2,317 (36 percent) and 258 (29 percent) on the weekends. These electronic technicians were generally scheduled off on the weekend. Therefore, when they were called in to work on the weekends they received a guaranteed 8 hours of overtime. In comparison, the other nine electronic technicians only reported 341 overtime and 2 penalty overtime hours on the weekends.

■ Another three of the 13 electronic technicians on Tour 1 had an average of 563 overtime hours. This was the highest average of overtime hours for all three tours,[2] and resulted in an average 34 (6 percent) to 318 (129 percent) more overtime hours when compared to electronic technicians on tours 2 and 3.

---

1. We reviewed FY 2016 overtime data spanning October 1, 2015, through May 31, 2016.
2. Tour 1 represents the graveyard shift from 8:08 p.m. to 4:58 a.m., Tour 2 represents the day shift from 4:08 a.m. to 12:58 p.m., and Tour 3 represents the evening shift from 12:08 p.m. to 8:58 p.m.

7

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center Report Number HR-AR-16-005

Additionally, we found:

▪ Five of the 13 electronic technicians (or 38 percent) had an average daily Internet usage of between 24 and 66 minutes during workhours, which exceeded the 18-minute daily average use. Four of the five also had above average overtime and penalty overtime during FY 2014 through May 2016.

▪ Management used electronic technicians instead of other qualified maintenance employees at a lower labor rate to move machinery. Eight of the 13 electronic technicians spent 38 percent more regular workhours moving machinery than the mail processing equipment mechanics (who are paid at a lower labor rate).

▪ Supervisors did not periodically evaluate electronic technicians' performance on maintenance routes, as required.

These incidents occurred because maintenance management always staffed three electronic technicians per tour without determining actual workload and did not assign supervisors to oversee electronic technicians between 10:30 p.m. and 4:00 a.m. during Tour 1 and on weekends. In addition, supervisors did not monitor employees' computer usage, assigned electronic technicians to move machinery because they believed it was more efficient during the entire machine movement process instead of assigning them as needed in the process. Lastly, management did not have a clear understanding of the policy to evaluate technicians' performance on maintenance routes.

As a result, the Postal Service incurred unnecessary overtime and penalty overtime costs of $214,155 during FYs 2014 and 2015. For FY 2016, management can potentially save at least $107,078 by reducing electronic technicians' overtime and penalty overtime hours by 58 percent to achieve the average overtime usage of electronic technicians at comparable facilities.

If management effectively aligns their workforce with workload and provides sufficient oversight, the Postal Service could save funds by reducing unnecessary overtime.

## Management of Overtime

Madison P&DC management did not effectively manage overtime for the 13 electronic technicians identified in the congressional inquiry. The overtime percentage to workhours for the 13 electronic technicians was 9.5 percent, which was higher than that of the other electronic technicians' combined 7.3 overtime percentage to workhours for FY 2014 through May 31 in FY 2016. For FY 2014 through May 31, 2016, these electronic technicians had a combined total of 6,421 of 8,473 total overtime hours (76 percent) and 895 of 1,097 total penalty overtime hours (82 percent) reported by all electronic technicians at the facility. The other nine electronic technicians averaged 228 overtime hours each, the 13 electronic technicians averaged 494 overtime hours each (117 percent greater). The 13 electronic technicians' annual overtime payment amounts ranged from $4,733 to $17,508 (between 7 to 27 percent) and from $2,511 to $12,540 (between 4 to 19 percent) of their salary in FYs 2014 and 2015, respectively.

Specifically, the 13 electronic technicians received 2,317 of the 6,421 overtime hours (36 percent) and 258 of the 895 penalty overtime hours (29 percent), on the weekends, which was, generally, their scheduled day off, resulting in 8 hours of guaranteed overtime. Three electronic technicians had 563 of 6,421 overtime hours, which was the highest average of overtime hours on Tour 1 and resulted in an average of 34 (6 percent) to 318 (129 percent) more overtime hours compared to electronic technicians on Tours 2 and 3.

3   During FYs 2014 and 2015, the facility had 22 and 18 electronic technicians onboard, respectively, and 15 onboard by May 31, 2016.

8

Case 2:18-cv-00088-WED   Filed 01/17/18   Page 9 of 27   Document 1-3

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center
Report Number HR-AR-16-006

## Overtime on Weekends

During FY 2014 through May 2016, the 13 electronic technicians received 2,317 of the 6,421 overtime hours (36 percent) and 258 of the 895 penalty overtime hours on the weekends (29 percent), which was, generally, their scheduled day off and resulted into 8 hours of guaranteed overtime. In comparison, the other nine electronic technicians only reported 341 overtime and 2 penalty overtime hours on the weekends. Any additional hours worked past 8 hours in a day was considered penalty overtime. During FYs 2014 and 2015, Saturday and Sunday were the top two scheduled days off for 12[4] of the 13 technicians.

Additionally, during FYs 2014 and 2015, the electronic technicians' scheduled days off accounted for 88 percent of overtime and penalty overtime hours combined. During the first 8 months of FY 2016 ending on May 31, 2016, all 13 electronic technicians reported 91 percent of overtime and penalty overtime hours on their scheduled days off.

During FYs 2014 and 2015, 12 of the 13 electronic technicians incurred the highest overtime hours on Saturdays with 559 overtime hours in FY 2014 (85 percent) and 366 on Sunday in FY 2015 (69 percent). Also, these 12 electronic technicians incurred an average of 13 overtime hours on Saturdays in FY 2014 and 10 overtime hours on Sundays in FY 2015 (see Table 1).

**Table 1. 13 Electronic Technician's Daily Overtime Analysis**

| Day | FY 2014 | | | | FY 2015 | | | |
|---|---|---|---|---|---|---|---|---|
| | Number of Days with Overtime | Overtime Hours | Average Overtime Hours | Percent of Days with Overtime | Number of Days with Overtime | Overtime Hours | Average Overtime Hours | Percent of Days with Overtime |
| Saturday | 44 | 559 | 13 | 85% | 34 | 279 | 8 | 65% |
| Sunday | 42 | 475 | 11 | 81% | 36 | 366 | 10 | 69% |
| Monday | 40 | 441 | 11 | 77% | 34 | 336 | 10 | 65% |
| Tuesday | 35 | 291 | 8 | 67% | 32 | 219 | 7 | 62% |
| Wednesday | 34 | 308 | 9 | 65% | 38 | 360 | 9 | 73% |
| Thursday | 35 | 262 | 7 | 67% | 28 | 222 | 8 | 54% |
| Friday | 32 | 224 | 7 | 62% | 27 | 174 | 6 | 52% |
| Total | 262 | 2,559 | | 72% | 229 | 1,956 | | 63% |

Source: OIG analysis of overtime data from the Time and Attendance Collection System (TACS).[5]

---

4   During FYs 2014 and 2015, one of the 13 electronic technicians did not incur any overtime or penalty overtime hours.
5   TACS gives supervisors access to employee time records and other timekeeping functions.

Case 2:18-cv-00088-WED   Filed 01/17/18   Page 10 of 27   Document 1-3

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

## Overtime on Tour 1

Three of the 13 electronic technicians on Tour 1 had an average of 563 overtime hours, which was the highest average of overtime hours for all three tours from October 1, 2013 through May 31, 2016. These three electronic technicians reported an average 34 (6 percent) to 318 (129 percent) more overtime hours when compared to electronic technicians on Tours 2 and 3 (see Table 2).

**Table 2. Overtime Usage by Tour[6]**

| Tour | Number of Assigned Electronic Technicians | Total Overtime Hours | Tour Percentage of Total Overtime | Average Overtime Hours per Electronic Technician | Tour 1 Overtime Hours Compared to Tours 2 & 3 |
|---|---|---|---|---|---|
| Tour 1 | 3 | 1,690 | 26% | 563 | |
| Tour 2 | 8 | 4,239 | 66% | 530 | 563 less 530 = 34 or 6% |
| Tour 3 | 2 | 491 | 8% | 246 | 563 less 246 = 318 or 129% |
| Total | 13 | 6,421[7] | 100% | | |

Source: OIG analysis of overtime data from TACS.

This overtime occurred because:

■ Management's practice was to staff each tour with at least three electronic technicians to ensure adequate coverage to address any unforeseen events, such as the breakdown of machines. The maintenance manager did not make any official determination of actual workload. When any of three regularly scheduled electronic technicians were on leave or in training, management assigned overtime for coverage. Plant management acknowledged they need to better align maintenance staff with workload and that revising work schedules could help reduce overtime.

Scheduling employees is an operational function based on workload projection and service commitments. Supervisors should schedule employees using a process that schedules and assigns employees to achieve desired productivity rates, within budgetary constraints. The facility supervisor is responsible for minimizing the use of premium pay hours.[8]

■ Management did not assign supervisors to oversee electronic technicians between 10:30 p.m. and 4:00 a.m. during Tour 1 and on the weekends. Management stated the facility is currently staffed with their authorized number of maintenance supervisors according to their staffing package[9] and that their current complement of three supervisors cannot cover every hour of each tour 7 days a week. One of the maintenance supervisors stated that supervisors had not been assigned to Tour 1 for about 2 years or on weekends for about 6 years. However, management could adjust supervisor schedules to cover Tour 1 and weekends.

---

6  This represents the overtime used by all the electronic technicians on the rolls during FYs 2014 and 2015.
7  Figure may differ due to rounding.
8  Handbook F-401, Supervisor's Guide to Scheduling and Premium Pay, Section 2.A, August 2000.
9  Work Hour Estimator Program, which is designed to create a staffing package for a plant.

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

Supervisors assigned to the plant are responsible for overseeing performance — both good and bad.[10] Insufficient supervision may lead to unacceptable business practices such as decreased employee productivity and opportunities for misconduct such as improper use of office equipment, which could result in potentially unnecessary overtime.

While the facility's 22 electronic technicians in FY 2014 reported overtime as 10.7 percent of their workhours and 18 electronic technicians in FY 2015 reported 8 percent of their workhours as overtime, we identified three comparable facilities that used significantly lower amounts of overtime, ranging from 1.1 to 7.6 percent during the same period. All three maintenance managers at these facilities stated they did not require a number of electronic technicians for each tour. Another maintenance manager indicated he tried to limit the number of electronic technicians on leave at a time, with only one employee off at a time on Tours 1 and 3 and only two employees off at a time on Tour 2 (see Table 3).

*Five of the 13 electronic technicians (or 38 percent) had an average daily Internet use of between 24 and 66 minutes, which exceeded the 18-minute daily average Internet use of the 13 electronic technicians combined.*

Table 3. Comparable Facilities with Lower Overtime Usage

| Facility | Overtime Percentage of Workhours | | Electronic Technician Complement | Average Overtime Hours Per Electronic Technician |
|---|---|---|---|---|
| | FY 2014 | FY 2015 | | |
| Facility 1 | 1.1% | | 36 | 18 |
| Facility 2 | 7.3% | | 16 | 111 |
| Facility 3 | 7.6% | | 19 | 109 |
| Madison P&DC | 10.7% | | 22 | 177 |
| Facility 3 | | 6.3% | 16 | 100 |
| Madison P&DC | | 8.1% | 18 | 142 |

Source: OIG analysis of overtime data from TACS.

When supervisors do not properly align workforce to workload, the Postal Service incurs unnecessary overtime and forfeits its opportunity to reduce costs. As a result, the Postal Service incurred unnecessary overtime and penalty overtime costs of $214,155 during FYs 2014 and 2015. We estimate a cost savings of at least $214,155 during FYs 2016 and 2017 by achieving the average overtime usage at comparable facilities, resulting in at least a $107,078 savings annually.

### Above Average Internet Usage

Five of the 13 electronic technicians (or 38 percent) had an average daily Internet use of between 24 and 66 minutes, which exceeded the 18-minute daily average Internet use of the 13 electronic technicians combined.

Two of the five electronic technicians far exceeded the average, one with 66 daily average minutes (266 percent above) and one with 49 daily average minutes (172 percent above) and had excessive Internet usage instances ranging from about 170 to 250 minutes. These two electronic technicians also visited a significantly higher volume of non-work related sites, consisting of various news, sport, social media, and retail websites.[11] Compared to the other 11 electronic technicians, one had above average overtime and penalty overtime usage both overall and during the weekends.

10  Handbook PO-420, *Small Plant Best Practices*, Section 2-2.x, Page 4, November 1999.
11  Usage times are conservative estimates. Some websites may be an advertisement or a pop-up window within a web page rather than a site visited by the user. Time spent on each website was not available.

11

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center Report Number HR-AR-16-006

*Management used electronic technicians instead of qualified maintenance employees who are paid at a lower labor rate, such as MPE mechanics and maintenance mechanics to move machinery.*

The remaining three electronic technicians exceeded the daily average, ranging from 24 minutes (33 percent above) to 28 minutes (56 percent above) and had excessive Internet usage instances ranging from 105 to 162 minutes. They visited several non-work related sites on either a Saturday or Sunday, when supervisors were not present. All three technicians had above average overtime and penalty overtime use while one of these three technicians had above average overtime during the weekends.

Electronic technicians normally use their computers for about 15 to 20 minutes daily to perform regular duties, such as identifying their assigned tasks for the day, researching maintenance issues, and acknowledging the completion of their tasks at the end of their tour.

Employees are permitted to make limited personal use of Postal Service office equipment provided it does not reduce or otherwise adversely affect the employee's productivity during workhours, interfere with the mission or operations of the Postal Service, or violate the standards for ethical conduct for employees of the executive branch. Use of Postal Service office equipment in violation or excess of the limited personal use permitted by this policy may result in limitations on future use, administrative action, criminal penalty, and/or personal liability.[12] Additionally, the Lakeland District's policy on uses of information resources prohibits employees from performing unofficial activities that may degrade the performance of information resources.[13]

These incidents occurred because maintenance supervisors did not monitor employees' computer usage. One maintenance supervisor stated that it is difficult to observe and identify employees improperly using Postal Service computers during workhours. For example, employees can quickly toggle or close their Internet browser to mask their activity when someone approaches. However, our research showed that a majority of employees monitor their employees and use computer monitoring technology to track employee Internet usage and the time spent both at and away from their computers.

Additionally, one of the five electronic technicians with above average computer use did not clearly understand the policy on limited personal use of Postal Service equipment. Two of the four electronic technicians were aware of the policy but chose not to follow; the remaining two were not available during our site visit.

During January 2016, a maintenance supervisor had a service talk with maintenance personnel to address concerns relating to excessive personal Internet use. Our review of Internet usage data during late January and early February 2016, showed no apparent reduction in Internet usage times or sites visited. If employees continue to abuse information resources during normal workhours, productivity may be adversely impacted, which could result in unnecessary overtime.

## Moving Machinery

Management used electronic technicians instead of qualified maintenance employees who are paid at a lower labor rate, such as mail processing equipment (MPE) mechanics and maintenance mechanics to move machinery. Electronic technicians have been involved in disassembling, physically moving, and reinstalling mail processing equipment. During FY 2015, eight of the 13 electronic technicians spent about 206 regular workhours and 42 overtime and penalty hours[14] moving machinery. This represents 38 percent more workhours than the 179 workhours seven of 10 MPE mechanics used to move machinery, for which they were paid at a lower labor rate.

12  Management Instruction – *Limited Personal Use of Government Office Equipment and Information Technology,* October 1, 2009.
13  Lakeland District – *Policy on Uses of Information Resources.*
14  Of these 248 hours, 206 were regular, 40 were overtime, and 2 were penalty overtime.

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

*We also found that supervisors had not performed periodic evaluations of electronic technicians' maintenance routes since calendar year 2011, to ensure they were adequately trained, as required.*

We also determined that 96 percent of the instances where electronic technicians spent 4 or more hours in a single day moving machinery occurred during Tour 2. The primary responsibility of electronic technicians on Tour 2 consists of preventative maintenance on mail processing equipment. When technicians move machinery for at least half of a work day, they may not have time for preventative maintenance tasks, which could result in potential overtime.

According to their job descriptions:

▪ Electronic technicians can "participate in the installation, removal, modification, assembly, and/or disassembly of systems and equipment." However, there is no mention of physically moving machinery.

▪ MPE mechanics can "install or alter equipment and circuits as directed."

▪ Maintenance mechanics "under the direction of skilled maintenance employees, (can) locate and correct sources of trouble and perform repair, relocation or modification of equipment or systems, disassemble equipment, and replace parts or components."

This occurred because plant management deemed it more efficient to use electronic technicians during the machine movement process, as opposed to assigning to other qualified maintenance employees at a lower labor rate. Management increased their reliance on overtime during these special tasks and projects due to their focus on using electronic technicians exclusively during project preparation and execution. This stretched staffing resources that are normally dedicated to routine maintenance routes and emergency repairs.

According to the facility's most recent staffing package dated May 5, 2015, the facility's authorized complement includes 12 electronic technicians, 11 MPE mechanics, and four maintenance mechanics. The job descriptions above show that management has qualified maintenance personnel other than electronic technicians to physically move equipment, as necessary. This would allow electronic technicians to spend their time more effectively performing other technical maintenance tasks.

If management used other qualified maintenance personnel instead of electronic technicians to perform machine movements, they could have saved $1,676 in regular labor costs during FY 2015. This would have allowed electronic technicians to complete tasks during regular workhours and avoid overtime.

## Employee Evaluations

We also found that supervisors had not performed periodic evaluations of electronic technicians' maintenance routes since calendar year 2011, to ensure they were adequately trained, as required.

This occurred because the maintenance manager did not instruct supervisors to perform evaluations. He stated that he was aware of the periodic performance evaluation policy; however, he did not enforce this policy because he had not seen or heard of employees being evaluated after their initial 90-day probation period. It was common practice and belief among the maintenance managers we interviewed at comparable facilities that this policy solely applied to new employees during the probationary period rather than as an ongoing developmental and feedback tool for their maintenance staff.

Supervisors should periodically evaluate the performance of each maintenance employee assigned to perform maintenance routes. Supervisors must accompany the employee during the entire route, complete the Maintenance Employee Evaluation Record, and maintain a record of the review on file for 2 years. [15]

When management does not routinely evaluate employees' performance, management is at risk of potentially being unaware of employees' deficiencies and their patterns of negative behavior, misconduct, or poor performance. In addition, management would have insufficient information to evaluate employee workload, which could lead to unnecessary overtime.

15   Handbook MS-63, *Maintenance Operations*, Section 8.4, June 2006.

# Recommendations

We recommend the acting district manager, Lakeland District, instruct maintenance management to:

1. Evaluate the practice of staffing three electronic technicians for each tour and establish an oversight process to review the work schedules of and assign work to electronic technicians to better align maintenance coverage with workload and control overtime use.

2. Develop work schedules for maintenance supervisors to ensure adequate oversight of maintenance personnel 7 days a week.

3. Develop and implement a process to monitor maintenance personnel's personal use of Postal Service computers during worktours to ensure compliance with the established policy for Internet usage.

4. Implement a process to evaluate the assignment of maintenance personnel to move machinery that ensures the economical and optimal use of resources.

5. Develop and implement a process to have supervisors periodically evaluate maintenance employees' performance, complete the Maintenance Employee Evaluation Record, and maintain a record of the review on file for 2 years.

## Management's Comments

Management partially agreed with the findings and recommendations, and disagreed with the monetary impact. Management indicated they could not make a proper assessment of the monetary impact without being provided with information on the specific facilities used in the calculation. They stated the Tucson P&DC in Arizona is a similar facility they normally use to compare with the Madison P&DC based on similarity in size, within 1% of their total mail volume, and contain the same equipment.

Regarding recommendation 1, management stated they partially agreed because it became a practice to staff three electronic technicians to each tour in order to complete tasks and collective bargaining unit agreements allowed employees to volunteer for overtime on an as needed basis. However, they will adopt a two-step verification process requiring approval by both the Maintenance Manager and Plant Manager for the use of overtime and penalty overtime hours based on the anticipated staffing needs for each upcoming work week by August 2016.

Regarding recommendation 2, management stated they agreed and will reassign one supervisor to Tour 1 with scheduled days off on Monday and Tuesday which will provide supervisory presence on all three tours and 7 days of the week by September 10, 2016.

Regarding recommendation 3, management stated they partially agreed because they are unable to install a monitoring software on computers. However, they will implement a process to log their daily observations of electronic technician activity at random intervals during all tours and work days and reiterate the policy for limited personal usage of Postal Service equipment and internet usage to the entire district by September 17, 2016.

Regarding recommendation 4, management stated they agree and will implement an approval process for staffing work orders involving the relocation of machinery by September 10, 2016.

Appendices     Recommendations     Findings     Table of Contents     Highlights

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

Regarding recommendation 5, management stated they agree and will implement a process to periodically evaluate electronic technician's performance by September 17, 2016.

See Appendix B for management's comments in their entirety.

## Evaluation of Management's Comments

The OIG considers management's comments responsive to the recommendations in the report and corrective actions should resolve the issues identified in the report.

Regarding management's disagreement with our monetary impact calculation, we subsequently provided management with additional information regarding the three comparable P&DCs with electronic technicians reporting lower overtime usage than the Madison P&DC. We identified these facilities based on their comparable major machinery, annual mail volume, electronic technician complement, and annual and sick leave usage. The previous acting district manager agreed with the selection factors. Based on these five factors reviewed by the OIG, compared to the three similar factors used by management, we did not identify the Tucson P&DC as a comparable facility. However, management believes the Tucson P&DC is more comparable and stated that the facility used almost no penalty overtime but their regular overtime rate and hours are almost double that of the Madison P&DC. We believe the two additional factors we reviewed, combined with the thorough data analysis of each factor spanning FYs 2014 and 2015, led us to identify facilities which were more closely comparable to the Madison P&DC.

Additionally, we acknowledge collective bargaining agreements and differences in scheduled days off may have attributed to the difference in the overtime usage by the two groups of electronic technicians. However, we believe other factors also affected overtime usage such as the alignment of maintenance coverage with workload and scheduling of maintenance supervisors for adequate oversight of electronic technicians. These factors were within management's control and were ultimately addressed in their proposed action plan.

All recommendations require OIG concurrence before closure. Consequently, the OIG requests written confirmation when corrective actions are completed. All recommendations should not be closed in the Postal Service's follow-up tracking system until the OIG provides written confirmation that the recommendations can be closed.

Case 2:18-cv-00088-WED    Filed 01/17/18    Page 17 of 27    Document 1-3

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

# Appendices

*Click on the appendix title
to the right to navigate
to the section content.*

Appendix A: Additional Information ...................................................18

Background ...............................................................................18

Objective, Scope, and Methodology ....................................18

Prior Audit Coverage ...............................................................19

Appendix B: Management's Comments ...............................................20

17

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

# Appendix A: Additional Information

## Background

The Postal Service uses overtime to provide flexibility and meet operational requirements. Overtime is a premium that non-management craft employees receive for work performed in excess of 8 paid hours in a day or 40 paid hours in a week. Penalty overtime is paid at two times an employee's hourly rate when they work on more than 4 of their 5 scheduled days in a week or more than 6 days in a week, over 10 hours on a regularly scheduled day, or over 8 hours on a non-scheduled day.

The primary responsibility of the Maintenance organization at the field level is direct, "hands-on" maintenance of equipment, facilities, and grounds. It must ensure that these assets are maintained to provide optimum performance and minimal down-time, as well as provide a safe, environmentally compliant, and energy efficient environment for our internal and external customers; and protect the capital investment of the Postal Service.[16] Local management must ensure that they have adequate resources to fulfill these responsibilities. Maintenance requires comprehensive planning that uses the best available labor resources, repair parts, supplies, and time allocated for maintenance activities.[17]

Electronic technicians are responsible for performing diagnostic, preventive maintenance, alignment and calibration, and overhaul tasks, on both hardware and software on a variety of mail processing, customer service, and building equipment and systems.

The Madison P&DC in the Lakeland District of the Great Lakes Area had 22 and 18 electronic technicians onboard in FYs 2014 and 2015, respectively. Additionally, their reported overtime as a percentage of their workhours during this time was 10.7 percent in FY 2014 and 8 percent in FY 2015. According to the facility's last approved staffing packages dated May 2013 and May 2015, the facility has had an authorized electronic technician complement of 23 and 12, respectively. As of the end of FY 2015, the facility had 15 electronic technicians onboard.

## Objective, Scope, and Methodology

Our objective was to assess the management of electronic technicians' overtime at the Madison P&DC. To accomplish our objective, we:

■  Reviewed policies, procedures, and contract agreements related to overtime use, use of information resources, and use of employee break times.

■  Interviewed the complainant to confirm the details of the allegation.

■  Interviewed area, district, plant, and maintenance management to understand the maintenance organization's process for monitoring and controlling overtime.

■  Analyzed the facility's overtime use during FYs 2014, 2015, and 2016 (through May 31).

■  Benchmarked the facility's overtime use against other similarly sized P&DCs.

16  Handbook MS-63, Section 2.3, June 2006.
17  Handbook MS-63, Section 13.1, June 2006.

18

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

We conducted this performance audit from March through September 2016, in accordance with generally accepted government auditing standards and included such tests of internal controls as we considered necessary under the circumstances. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective. We discussed our observations and conclusions with management on August 22, 2016, and included their comments where appropriate.

We assessed the reliability of TACS and the eMaintenance Activity Reporting and Internet usage data by confirming our analysis and results with management and other data sources. We determined that the data were sufficiently reliable for the purposes of this report.

## Prior Audit Coverage

| Report Title | Report Number | Final Report Date | Monetary Impact |
| --- | --- | --- | --- |
| Overtime at the Iowa City Post Office | HR-MA-14-009 | 9/18/2014 | None |

**Report Results:** Our report determined that the amount of overtime at the Iowa City Post Office was significantly greater than the Postal Service's national goal. Specifically, in FY 2013, overtime was 13.9 percent of total workhours at the Iowa City facility compared to the national goal of 5.6 percent and the national average rate of 9.3 percent. In addition, from January 2013 through January 2014, facility employees, on average, worked 6 days a week, 40 percent of the time because carrier positions were understaffed and parcel volumes increased. Additionally, facility management did not perform route inspections or effectively divide overburdened or vacant routes among carriers. Finally, management did not follow overtime procedures, resulting in overtime grievance payouts 179 percent higher than the national average. Management agreed with our recommendations to establish and implement a plan to recruit and retain employees at the Iowa City Post Office, implement procedures to ensure all routes are structured within 8-hour assignments to reduce overtime use and to ensure Iowa City Post Office management pivots available routes, and train facility management on techniques to effectively manage overtime with existing staff to reduce overtime grievances.

18  The Postal Service uses the Electronic Maintenance Activity Reporting and Scheduling system to provide maintenance reporting and tracking for parts and labor for buildings and equipment nationwide.

19

Appendix B:
Management's Comments

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

UNITED STATES
POSTAL SERVICE

DISTRICT MANAGER
LAKELAND DISTRICT

September 16, 2016

LAURIE DILLARD
DIRECTOR, AUDIT OPERATIONS

SUBJECT: Management of Electronic Technicians' Overtime at the Madison,
Wisconsin, Processing and Distribution Center
Project Number 16RG0111HR000
Report Number HR-AR-16-DRAFT

In reference to the OIG Audit report (Report Number HR-AR-16), management only
partially agrees with the findings. The Madison Plant Manager reevaluated the staffing
practices and oversight of the electronic technicians.

However, management disagrees with the OIG calculations of the monetary impact and
the comparison to other facilities. The audit findings represent a cost to the Postal
Service of $214,155 more for overtime and penalty overtime use over the past two fiscal
years for the Electronic Technicians (ETs) at the Madison P&DC, compared with three
other facilities with an additional cost of $213,831 over the next 2 years if their overtime
practices don't change. Without being provided with information on those specific
facilities, it is not possible for us to make a proper assessment. Madison has done a
comparison with a very similar facility showing that they have actually cost the Postal
Service over $270,000 less money in these premium workhours. The data and
calculations are in Recommendation #1 below.

The report also discusses the disparity in overtime rates between 22 different ETs
ranging from 9.5% overtime for one group of 13 and 7.3% for the remaining 9. All craft
employees in a plant are covered by one of two collective bargaining agreements. Those
agreements both have provisions in them allowing an employee to volunteer for overtime
or not. We have an obligation to avoid giving overtime to the employees that did not
volunteer for it. Overtime is given to the employees that volunteer for it on an as needed
basis. Even the employees that volunteer for overtime have different schedules and
different scheduled days off. These facts can all cause a large difference in the amount
of overtime that individuals receive.

Recommendation #1

Evaluate the practice of staffing three electronic technicians for each tour and establish
an oversight process to review the work schedules of and assign work to electronic
technicians to better align maintenance coverage with workload and control overtime use.

PO Box 5000
MILWAUKEE WI 53201-5000

1

20

**Management Response/Action Plan:**

Management agrees, in part, with this recommendation.

Staffing of three electronic technicians (ETs) on each tour as a blanket policy is not an efficient or effective way to staff any unit. The total number of ET hours that are used (overtime included) has historically been an appropriate number of hours based on the authorized EWHEP (staffing authorization). The Madison P&DC has always tried to evenly distribute the maintenance workload among the tours. In order to complete the work on each tour, it has become a practice to staff three ETs per tour.

The workhour budgeted plan for the Maintenance department is based on a strict EWHEP hours usage plan. In FY 2014, out of 140,000 workhours, the Maintenance department was only 211 hours over their plan. In FY 2015, the workhour budget for the Maintenance department was 139,194 hours, and they only used 131,561, which was 5.5% below their planned workhours. The additional 7,633 hours, if it had been used, would have been worked at the overtime rate, which saved the Postal Service $768,902 in FY 2015.

The report points out that the overtime is not evenly spread out between the three tours or between the days of the week. This is a result of a requirement in the national bargaining unit agreement to create as many "preferential" bid jobs as possible. This equates to more positions being staffed during the daytime and during Monday through Friday. The fact that there is at least some overtime being worked on each tour and on each day of the week shows that there is not one particular area that is overstaffed.

The report also compares the Madison P&DC to three other facilities in the country that are claimed to be "comparable to Madison." Even after being asked to provide the names of those facilities so that management in Madison could make an assessment as to the similarities of those plants to Madison, that information has not been provided. Management at Madison has another facility that they have used many times over the past several years to make comparisons as they are similar in size, are within 1% of the total mail volume of Madison and have virtually the exact same equipment set as Madison. The facility that we selected was the Tucson, Arizona, P&DC. This facility has used almost no penalty overtime, but their regular overtime rate and hours are nearly double that of Madison.

In FY 14 and FY 15, at the workhour rates cited ($32.22 for Level 10 ET) in the report, Madison spent $68,951 more on penalty overtime than the comparison facility but spent $342,497 less on overtime in LDC 36 for a net total of $273,546 less money spent on premium workhours than this similar facility. National and local agreements sometimes force the use of penalty overtime hours, especially during the holiday weeks that the Postal Service recognizes.

2

21

Management of Electronic Technicians' Overtime at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

**Tucson FY 14**

| LDC | Linecode Desc. | Work hours | OT Hrs | POT Hrs | OT % | POT % |
|---|---|---|---|---|---|---|
| 35 | Supv-plant & Equip M | 13374 | 1213 | 7 | 9.1% | 0.00% |
| 36 | Postal Operating Equip | 53490 | 9017 | 6 | 16.9% | 0.01% |
| 37 | Building Sys Equip | 19047 | 2931 | 6 | 15.4% | 0.03% |
| 38 | Building Serv-custod | 29402 | 3244 | 0 | 11.0% | 0.00% |
| 39 | Mnt plng cntrl stors | 6788 | 756 | 0 | 11.2% | 0.00% |
| Grand Total | | 122141 | 17161 | 13 | 14.1% | 0.01% |

**Madison FY 14**

| LDC | Linecode Desc. | Work hours | OT Hrs | POT Hrs | OT % | POT % |
|---|---|---|---|---|---|---|
| 35 | Supv-plant & Equip M | 11629 | 1244 | 0 | 10.1% | 0.00% |
| 36 | Postal Operating Equip | 63613 | 6136 | 807 | 9.7% | 1.27% |
| 37 | Building Sys Equip | 17371 | 132 | 18 | 0.8% | 0.10% |
| 38 | Building Serv-custod | 37598 | 1337 | 248 | 3.6% | 0.66% |
| 39 | Mnt plng cntrl stors | 8291 | 1377 | 107 | 16.7% | 1.30% |
| Grand Total | | 138240 | 10226 | 1180 | 7.4% | 0.85% |

**Tucson FY 15**

| LDC | Linecode Desc. | Work hours | OT Hrs | POT Hrs | OT % | POT % |
|---|---|---|---|---|---|---|
| 35 | Supv-plant & Equip M | 16729 | 1920 | 0 | 11.5% | 0.00% |
| 36 | Postal Operating Equip | 58985 | 8337 | 4 | 14.6% | 0.01% |
| 37 | Building Sys Equip | 13133 | 1808 | 2 | 13.8% | 0.02% |
| 38 | Building Sys Equip | 31341 | 3221 | 0 | 10.3% | 0.00% |
| 39 | Mnt plng cntrl stors | 6430 | 970 | 8 | 15.2% | 0.13% |
| Grand Total | | 124588 | 16256 | 14 | 13.0% | 0.01% |

**Madison FY 15**

| LDC | Linecode Desc. | Work hours | OT Hrs | POT Hrs | OT % | POT % |
|---|---|---|---|---|---|---|
| 35 | Supv-plant & Equip M | 11598 | 1007 | 0 | 8.7% | 0.00% |
| 36 | Postal Operating Equip | 58128 | 3666 | 274 | 6.3% | 0.47% |
| 37 | Building Sys Equip | 16460 | 297 | 6 | 1.8% | 0.04% |
| 38 | Building Sys Equip | 39504 | 1912 | 0 | 6.3% | 0.00% |
| 39 | Building Serv-custod | 8355 | 1615 | 234 | 19.3% | 0.65% |
| | Mnt plng cntrl stors | | | 27 | | 0.32% |
| Grand Total | | 131161 | 8508 | 541 | 6.5% | 0.41% |

3

22

**Action Plan:**
In order to more closely monitor and scrutinize the use of overtime and penalty overtime in the Maintenance department, the Madison P&DC has adopted a two-step verification process for the use of these hours. The supervisor makes a request based on their anticipated staffing needs for the coming week. That is submitted to the Maintenance Manager for analysis. After his analysis, that is submitted to the Plant Manager for review prior to the week beginning.

**Target Implementation Date:**
This staffing review has been implemented effective in August of 2016.

**Responsible Official:**
The Maintenance Manager is responsible for ensuring that this process is followed weekly.

**Recommendation #2**

Develop work schedules for maintenance supervisors to ensure adequate oversight of maintenance personnel 7 days per week.

**Management Response/Action Plan:**
Management agrees with this recommendation.

The Madison P&DC does agree that with four supervisors, we are able to cover more than two tours five days per week. One supervisor will be reassigned to Tour 1 with Monday and Tuesday off days. This will give a supervisory presence on all three tours and seven days per week.

**Target Implementation Date:**
September 10, 2016.

**Responsible Officials:**
The responsible officials for the reassignment of the personnel are the Madison Plant Manager and District Human Resources Manager.

**Recommendation #3**

Develop and implement a process to monitor Maintenance personnel's personal use of Postal Service computers during workhours to ensure compliance with the established policy for internet usage.

**Management Response/Action Plan:**
Management agrees, in part, with this recommendation.

Madison management is not able to install any type of monitoring software on the computer systems. However, we are developing an observation log that will be used by all management personnel in the Plant to observe and document what activities the ETs are engaged in at random intervals during all tours and workdays. The Acting District

Manager will send out messaging to the entire District re-iterating the policy for limited personal usage of postal equipment and internet usage.

**Target Implementation Date:**
September 17, 2016.

**Recommendation #4**

Implement a process to evaluate the assignment of Maintenance personnel to move machinery that ensures the economical and optimal use of resources.

**Management Response/Action Plan:**
Management agrees with this recommendation.

At this time, there are no plans to relocate any fixed equipment within the Madison Plant. Should that need arise in the future, the work order for that movement will be signed off by the Plant Manager or his designee indicating his approval for the work to be done and it will include who will be assigned to complete that work. Only work that requires a Level 10 ET will be assigned to an ET.

**Responsible Official:**
Madison Plant Maintenance management will have a responsibility for completing a log sheet. Each tour will complete a log and it will be submitted to the Plant Manager for review of the activities and the action taken on any activity found to be inappropriate.

**Target Implementation Date:**
September 17, 2016.

**Recommendation #5**

Develop and implement a process to have supervisors periodically evaluate Maintenance employees' performance, complete the Maintenance Employee Evaluation Record, and maintain a record of the review on file for two years.

**Management Response/Action Plan:**
Management agrees with this recommendation.

We will perform an initial review of each ET to set a baseline. After that, at least once per calendar year, each ET will have a subsequent evaluation performed and the results will be discussed with each individual to identify any deficiencies or improvements made.

**Responsible Official:**
The Maintenance manager will be responsible for complying with this instruction.

**Target Implementation Date:**
September 10, 2016.

5

24

Management of Electronic Technicians' Overtime
at the Madison Processing & Distribution Center
Report Number HR-AR-16-005

**Responsible Official:**
The Plant Manager will have oversight. The Maintenance managers will be responsible
for compliance to ensure that the supervisors are performing the review on the ETs
assigned to their tour.

If you have any questions, please contact me.

Deborah S. Woodrum
Acting District Manager



OFFICE OF
INSPECTOR
GENERAL
UNITED STATES POSTAL SERVICE

Contact us via our Hotline and FOIA forms.
Follow us on social networks.
Stay informed.

1735 North Lynn Street
Arlington, VA 22209-2020
(703) 248-2100